UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
YOLANDA PALOMO, MONISHA HARRELL, and     :
DANIELLE POW,                            :
                                         :
                    Plaintiffs,          :      03 Civ. 7853 (DLC)
                                         :
          -v-                            :      OPINION AND ORDER
                                         :
THE TRUSTEES OF COLUMBIA UNIVERSITY IN    :
THE CITY OF NEW YORK, ETHAN HANABURY,     :
and JAKI SITTERLE,                        :
                                         :
                    Defendants.          :
                                         :
----------------------------------------X

Appearances:

For the Plaintiffs:

Scott Browning Gilly
Michelle M. le Roux
Thompson Wigdor & Gilly LLP
350 Fifth Avenue, Suite 5720
New York, New York  10118


For the Defendants:

Edward A. Brill
Susan D. Friedfel
Proskauer Rose LLP
1585 Broadway
New York, New York  10036


DENISE COTE, District Judge:

     The defendants the Trustees of Columbia University

("Columbia"), Ethan Hanabury ("Hanabury") and Jaki Sitterle

("Sitterle") bring a motion for summary judgment in this

employment discrimination action.  For the following reasons, the

motion is granted.

## BACKGROUND

The following facts are undisputed or taken in the light most favorable to the plaintiffs, unless otherwise indicated. The plaintiffs Yolanda Palomo ("Palomo"), Monisha Harrell ("Harrell"), and Danielle Pow ("Pow") each worked in the Executive Education department at the Columbia Graduate School of Business ("Department"). The Department markets and administers non-degree programs to companies and executives throughout the world. Hanabury is the Associate Dean for the Department, which as of February 2002, had 32 non-faculty employees, two-thirds of which were women. As of that time, there were five non-faculty staff members who held Director level positions in the Department, including Palomo and Pow. There were two Executive Directors, each of whom was a woman, and one of whom was defendant Sitterle. Sitterle became an Executive Director at grade level 15 in June 1998, and had at least two Director level employees reporting to her since May 1999.

While each of the plaintiffs is a woman and brings claims based on gender discrimination, the claims represent two entirely separate sets of issues. Palomo became pregnant in 2002 and contends that Hanabury required her to report to Sitterle instead of him when he learned of her pregnancy, and that she otherwise suffered discrimination due to her pregnancy. Harrell and Pow are lesbians and domestic partners and accuse Hanabury, who is a homosexual man, of sharing too much detail from his personal life with them. Their complaints range over incidents that occurred

between 1998 and the dates they left Columbia in 2002 and 2003. The facts underlying Palomo's claims will be described first.

A.  Facts Underlying Palomo's Claims

Palomo joined the Department in August 1990 as a program coordinator.  When Hanabury was appointed Associate Dean in June 1997, Palomo was an Associate Director at grade 12.  In June 2000, Palomo was promoted to Director of Sales and Administration for Open Enrollment at Hanabury's suggestion.  She reported directly to Hanabury and supervised approximately a dozen employees.

1.  Impact of September 11, 2001

After September 11, 2001, the demand for the Department's programs declined substantially and to the extent it survived shifted from open enrollment to custom programs, which were the responsibility of Sitterle's group.  As a result, Hanabury decided in late 2001 to restructure the Department.  Pursuant to this plan, in early 2002, Palomo became Director of Relationship Management and Partnerships with responsibility for alumni relationships, key accounts and relationship management.  She continued to report directly to Hanabury, but lost most of her direct reports and supervised only one person.  In his June 2002 year-end performance evaluation of Palomo, Hanabury stated that he found her "overall performance less consistent" after the reorganization.  He marked as areas for development Palomo's

"resistance" to looking at things in a new way; noted an
"inconsistent" effort, and suggested that she take a business
writing course.  He suggested that she concentrate on "driving
the overall strategy and creation of <u>new</u> partnerships, partly
through your international visits."  (Emphasis in original.)
Palomo does not bring any claims based on this restructuring of
her work or this performance review.

In the Spring of 2002, Hanabury contemplated additional
restructuring.  The parties dispute his motives in doing so.
Hanabury contends that additional changes were needed to maximize
efficiency.  Palomo believes Hanabury had learned that she had
experienced a miscarriage and suspected that Palomo would again
be trying to become pregnant.  Palomo has testified that she told
Sitterle during a business trip that she had suffered a
miscarriage.  Harrell has testified that in early 2002, Hanabury
told her and Pow that he had learned from Sitterle that Palomo
had disclosed to Sitterle during a business trip that she was
pregnant.  Both Pow and Harrell have testified that Hanabury
asked them in early 2002 if they believed that Palomo was
pregnant; neither of them were able to shed any light on the
issue during that conversation.

In any event, in the Spring of 2002, Hanabury decided that
Palomo would report to Sitterle instead of to him.  In May 2002,
he met with the Dean of the Business School and presented a draft
organization chart reflecting this change in the reporting
structure.  The Dean approved of the plan.  The plan did not

4

result in any change to Palomo's salary, title or grade.

On August 13, Hanabury told Sitterle and Palomo that he wanted them to act as one department since the custom market was stronger. Hanabury stressed that they had some overlapping responsibilities regarding company visits. The next day, Hanabury met with the Associate Dean for Administration and Finance and showed him the organizational chart reflecting the fact that Palomo would be reporting to Sitterle.

### 2. September 5: Palomo Told to Report to Sitterle

On September 5, Hanabury told Palomo that he wanted her to assist with the custom work and report to Sitterle. He also told her that her direct report, Anthony Madonna, would be moving to the marketing team. Palomo contends that she objected strongly to reporting to Sitterle and threatened to resign if required to do so; she did not object to Hanabury moving Madonna. Hanabury told her that he would consider her request to continue to report to him. Palomo was told that she would retain all of her alumni management responsibilities. When Hanabury discussed this change separately with Sitterle, Sitterle reluctantly agreed to it.

On September 9, Hanabury informed Palomo that she could continue to report to him while assisting Sitterle's team as needed. The parties dispute whether this was presented as a proposal for a trial basis.

During a doctor's visit on August 26, Palomo had blood drawn to learn whether she was pregnant. During a September 11

doctor's visit, Palomo learned that she should not travel due to her high risk pregnancy.  Palomo left a voicemail message for Hanabury that her doctor had restricted her from traveling and that she would like to meet with him to discuss this.  She did not say that she was pregnant.  She was scheduled to travel in October to Japan for the Department.  In making arrangements to replace Palomo for this trip, Hanabury contends that he realized it was a mistake to not require Hanabury to report to Sitterle.

3.  September 12:  Palomo Informs Hanabury of her Pregnancy

On September 12, Hanabury met with Palomo and immediately informed her that she would be directly reporting to Sitterle; he did not want to be making decisions about who was going to be traveling for the Department.  Palomo then informed Hanabury for the first time that she was pregnant with a high risk pregnancy.  Hanabury congratulated her on the pregnancy.

On September 13, Palomo came to work for what was to be her last day before a scheduled vacation.  She met with Hanabury and Sitterle, and has testified that she felt that they were putting a lot of pressure on her.  She could not identify at her deposition what caused the feeling of pressure, except that she was asked to find an interpreter to translate a document before leaving on vacation.

On September 18, Palomo told Hanabury that she had been placed on disability leave by her doctor until October 17.  Hanabury wished her the best and informed her that should she

6

have any additional restrictions upon her work when she returned, she should submit them in writing by October 11.  Palomo did not make any such submission.  After an extension of her leave, Palomo returned to work on October 28.  She was again out of the office from October 30 to November 4.

During a meeting on November 8 with Sitterle and Palomo, Hanabury expressed concerns about Palomo's level of effort.  While a large part of Palomo's job had involved travel, she was restricted from travel by her doctor when she returned from her disability leave.  As a result, Hanabury explained that she would have to be flexible about her job responsibilities.  When Palomo requested a written job description, Hanabury suggested that Palomo prepare the initial draft.  Palomo did not mention any additional restrictions on her ability to work during the meeting.  Palomo contends that she felt under attack at the meeting, although she does not remember anything derogatory being said, other than the complaint about her level of effort.  Palomo also asserts that she felt she was being put under a lot of stress at the meeting regarding specific projects, but could not identify any of the projects during her deposition.

After the meeting, Sitterle sent Palomo several e-mails regarding projects.  One requested that Palomo contact a faculty member to find out when that person would have certain material ready for a project for which they had just received the approval from a client.  While Palomo admits that it is not unusual to have a short turnaround time for projects, Palomo felt that

Sitterle created an unnecessary sense of urgency.[1]

On November 11, Sitterle forwarded Palomo an e-mail from the Director of Program Management asking Palomo to respond. The e-mail requested a preliminary budget by 3:00 p.m. that day for a project assigned to Palomo. Palomo asked for and received more time to complete the budget.

On November 12, Sitterle sent Palomo an e-mail asking her whether she had sent certain information to a client. Palomo did not know whether it was the general practice in Sitterle's group to send such material to custom clients.

During November, Sitterle's team was very busy, and Palomo tried to leave the office each day at approximately 6:00 p.m., walking to an exit that did not require her to walk past Sitterle's office. Before her pregnancy, Palomo's work often required her to work a 14 hour day.

4. November 14: Hanabury Criticizes Palomo's Performance

On November 14, Hanabury met again with Sitterle and Palomo. Hanabury and Sitterle expressed disappointment in Palomo's performance, indicating that she was expected to work as hard or harder than other members of Sitterle's team given her grade level and title. Hanabury and Sitterle suggested that one way

_____

[1] Sitterle's e-mail read: "Yoly, This needs pushing with Rita and Bob. Can you get in touch with Rita today to find out when she can get some material to us. Please let her know we need to get this to JBIC by the end of next week. Actually, since you are out on Friday, it well need to go out Thursday. Thanks, Jaki."

8

for Palomo to integrate herself into Sitterle's team was to ask other members of the team if there was anything she could do to help before leaving for the day. Palomo indicated that she was doing her best and could not work more hours. Hanabury pointed out that if Palomo was having difficulty with her work load due to her health, then paid disability leave was available to her.

They also discussed Palomo's draft job description. Palomo had listed as one of her proposed responsibilities the managing of key accounts, some of which are located outside the New York metropolitan area. Sitterle pointed out that managing key accounts could not be a large portion of her job responsibilities so long as she was restricted from travel. Palomo did not disagree with that assessment at the meeting.[2]. Sitterle also pointed out that although Palomo listed having responsibility for the alumni of the Columbia Senior Executive Program ("CSEP"), those responsibilities included travel as well and that Palomo had not met the Fall CSEP class because she was on disability leave and would be on maternity leave when it was time to meet the Spring class. Shortly after the meeting, Palomo sent Sitterle an e-mail stating, "I'm feeling very sick, so I'm going to go home early."

---

[2] Palomo asserts in her affidavit that a client is visited only once a year and that her inability to travel was only temporary. Her affidavit does not address whether she would have wanted to continue with an extensive travel schedule after her child was born.

5.  November 15:  Palomo Learns of her Miscarriage

On November 15, during a visit to her doctor, Palomo learned she had had a miscarriage.  Between September 12 and November 15, Palomo was in the office for thirteen days.

6.  November 29:  Palomo Complains of Discrimination

On November 29, Palomo's attorney wrote a letter to the Dean of the Graduate School of Business, with a copy to Hanabury, alleging that Hanabury and Sitterle had discriminated against Palomo based on her pregnancy, that this misstreatment had caused her miscarriage,[3] and that she could not continue to work for Hanabury and Sitterle.  On December 24, Palomo filed a charge of pregnancy discrimination with the Equal Employment Opportunity Commission ("EEOC").[4]  Palomo amended this charge on January 20, 2003 to include allegations of retaliation.

7.  December:  Palomo Returns to Work and Takes Vacation

Palomo returned to work on December 2.  On December 10, she requested and was granted vacation from December 20 to January 2, 2003.  Before leaving on this vacation, Palomo sent holiday cards to about 800 alumni.  The list of clients who would receive holiday cards was not ready before Palomo left on vacation, and

_____

[3]  While Palomo's complaint in this action had initially alleged that the defendants had caused her miscarriage, based on uncontroverted medical evidence she no longer makes that charge.

[4]  The parties do not appear to have included Palomo's initial EEOC complaint with their motion papers.

in Palomo's absence, Sitterle signed them and sent them out
without Palomo's signature. Palomo contends in her affidavit
that holiday cards had been sent out late in prior years when
they were not ready by the holidays, and that previously she and
Sitterle had both signed cards sent to clients that they had
jointly visited.

   8.  January 2003:  Palomo Returns to Work

   On January 16, 2003, Palomo asked to take vacation in
February.  Susan Glancy, a Human Resources Department employee,
drafted Sitterle's response, denying the request and explaining
that Sitterle needed Palomo in the office with her in February.[5]

   Palomo and Sitterle had been scheduled to go on a business
trip to Brazil in the Fall of 2002.  The trip had been
rescheduled to January 2003.  When it was learned that Palomo
could not travel, Sitterle asked Michael Lendener to take
Palomo's place on the trip.  After Palomo's miscarriage, she did
not request that she be permitted to go on this trip to Brazil
and did not object to Lendener going on the trip.  On January 7
and 8, however, Palomo and Sitterle exchanged e-mails regarding
the trip.  It began with Palomo asking Sitterle how she should
respond to an inquiry she had just received as to why she wasn't
traveling to Brazil on that trip.  Sitterle suggested that Palomo
tell "the truth, that you had a medical condition that prevented

_____

   [5]  When Palomo requested vacation dates in March, that
request was granted.

11

you from traveling." Palomo responded that since she no longer had the medical condition, she would just say that there are "business issues keeping me in the office this month." Palomo then pointed out that on December 11, when a planning meeting was held to choose whom to visit in Brazil, she was no longer pregnant. Sitterle completed the exchange by explaining that Lendener had been asked to go in Palomo's stead before December 11 because the Department was accommodating Palomo's request not to travel.

On January 17, Sitterle sent Palomo a document entitled "position expectations," and asked for Palomo's "input." That same day, Palomo responded in writing asking whether the document was her new job description. She complained that the document contained "most" of her old job responsibilities "in addition to some other full time responsibilities." Besides complaining about the amount of work required, Palomo also objected that one specific task was administrative work at a grade 10 level. She also observed that it appeared as if she had been stripped of her alumni management responsibilities and would be required instead simply to assist others. She ended with a request for clarification before meeting to discuss the "new" expectations.

On January 20, Palomo amended her EEOC charge to add allegations of retaliation based on the Department sending holiday cards without her signature, denying her request for a vacation in February, denying her the opportunity to travel to Brazil on business, and giving her administrative

responsibilities usually performed by employees working at lower grades.

On January 23, Hanabury met with Palomo to review her job expectations.  Hanabury told Palomo that he wanted to put the EEOC charge aside and focus on moving ahead.  He assured her that he wanted her to stay in the Department.  Hanabury told Palomo that she would continue to work with Sitterle's team, but report directly to him.  They discussed the job description document that described Palomo as responsible for developing and maintaining alumni relationships.

In January, Palomo saw Sitterle's group meeting without her in a conference room.  Palomo does not know the purpose or subject of the meeting, and cannot say whether it related to a project that did not involve her.

In April 2003, Hanabury gave Palomo her year-end performance review.  Hanabury gave Palomo a positive review.  He told Palomo that instead of working with Sitterle's team, she would work with the Marketing and Open Sales team, led by Liz Zale.  Palomo approved of this change.

8.  Palomo Begins Her Plan to Relocate

In July 2003, Palomo applied for jobs in Las Vegas, near her family.  By September, Palomo began planning to relocate to Nevada.

In the Fall of 2003, Sitterle contacted alumni whom Sitterle was going to visit on an upcoming trip.  Palomo testified at her

deposition that she was the key contact for these alumni and that she believe that Sitterle should have asked Palomo to contact the alumni for her. Palomo submitted her resignation on November 5. Her last day of employment was December 17.

## B. Facts Underlying Harrell's and Pow's Claims

Pow began working at the Department as a casual employee in June 1997, following her graduation from Columbia's undergraduate program. She became a permanent employee in February 1998, as a Program Coordinator at Grade 10 with a salary of $32,000. In September 1998, Hanabury recommended that Pow be promoted to Marketing and Systems Coordinator at Grade 11, including a 7% salary increase. In October 1998, Phillip Vlahakis ("Vlahakis"), the Director of Marketing, resigned, and Pow assumed his responsibilities and reported directly to Hanabury until Robert Levy ("Levy") was hired. Pow received a promotion to Assistant Director, Grade 12, with a new salary of $45,368 effective February 23, 1999 in conjunction with her new role, and also received $5,000 of additional compensation for handling Vlahakis's responsibilities between his resignation and her promotion.

Harrell was hired as a permanent employee of the Department in June 1999 at Grade 10 with an annual salary of $40,000. She reported to Pow, her domestic partner.

1.  Levy's Conduct, July 1999 to May 2000

Levy was hired in July 1999, and supervised Pow.  Hanabury
was displeased with Levy's performance, and put him on a
performance action plan.  It is undisputed that Levy used his
office computer to view sexually explicit materials and to
participate in sexually explicit dialogue in gay chat rooms.  Pow
and Harrell learned about this in December 1999 during an effort
to ascertain the reason for high bandwidth use on the computer
system while updating Y2K patches on the Department's computers.
Pow and Harrell saw the materials Levy was viewing remotely, from
their own office, and Levy did not know that they were aware of
his activities; his computer faced the back wall of his office so
that others could not view the screen.

Pow and Harrell state that they informed Hanabury of Levy's
inappropriate computer use in February 2000 but that Hanabury did
not take action in response.  In late April 2000, Harrell walked
in on Levy while he was engaged in sexual conduct.  Harrell
reported this incident to Hanabury, who conducted an
investigation, including requesting and receiving documentation
from Harrell regarding Levy's inappropriate computer use earlier
that year.  Levy was asked to resign on May 4, and did resign.

2.  Promotions, May 2000 to June 2001

In May 2000, Harrell's position was upgraded to Grade 11,
and her salary was increased by 5% to $42,000.  Pow began
reporting directly to Hanabury again in 2000, and in June 2000,

Hanabury awarded Pow a 5% pay increase to $49,535.  In January
2001, Harrell was awarded an $8,000 increase in salary to
$50,000, and Pow was awarded a 20% salary increase.

At Pow's year-end review in June 2001, Hanabury gave Pow a
rating of "above average" and indicated that he continued to be
pleased with the quality of her performance, awarding her a 4%
salary increase.  In the section for employee comments on her
2000-2001 year-end review, Pow wrote that Hanabury's "feedback is
well thought out and constructive, encouraging one to push
boundaries and comfort zones and to develop into a more effective
manager.  [Hanabury's] dedication to the Executive Education team
and his support or each individual including myself is evident in
the continuous success of the department."


3.  Hanabury's Relationship With Pow and Harrell

Hanabury states that he came to regard Pow and Harrell as
friends as well as colleagues; Pow and Harrell deny that they had
any friendship with Hanabury.  When Hanabury's parents were
visiting New York, Hanabury invited Pow and Harrell to lunch to
meet them, and Pow and Harrell accepted the invitation.  Often,
when they were working late, Hanabury would invite Harrell and
Pow to join him for dinner and Harrell and Pow would accept.
During these dinners and on other occasions, Hanabury, Pow, and
Harrell would discuss their personal lives.[6]

---

[6]  Hanabury also had personal conversations with a man in
the Department, Troy Eggers.

Some of the topics of conversation between Hanabury and Harrell and Pow included Hanabury's dating life, travel plans, and other Department employees.  Harrell and Pow describe one sexually explicit conversation.[7]  Hanabury discussed with Pow and Harrell his upcoming vacation plans with a man he was dating in Michigan, and how it was difficult to maintain a long distance relationship.  On other occasions, Hanabury would ask Pow and Harrell whether they knew of any men suitable for him to date, and twice Pow suggested the name of a man with whom Hanabury might go on a date.

Hanabury would sometimes make observations about other employees, commenting on male employees he thought were "cute" or "good looking," that someone was thin or "looked good in his clothing," that someone had gained some weight, or that someone was losing his hair.  Hanabury commented about a male employee being in better shape while preparing for a marathon, and putting on a little bit of weight when not training, and that he was "the only thing he had to look at in the office."  Hanabury would also speculate about the sexual orientation of other employees and in that connection would comment on, for example, Eggers's interests in cooking and fine arts.

On a number of occasions, unfamiliar with computer scanning equipment, Hanabury asked Pow and Harrell to assist him in

---

[7]  Hanabury "commented that he had a very good night and when he sat down he took a very gingerly approach to sitting which was more of a – an indicator of the activity from the night before and appeared very proud of his activities."

scanning photographs of himself onto a computer so that he could post them with his profile on a gay male dating internet website. Hanabury asked Pow and Harrell to help him select the photographs that they thought "would attract him the most attention" from viewers.  None of the photographs were more revealing than seeing Hanabury in a bathing suit, although Pow and Harrell emphasize that some of the photographs showed him in his underwear and that one was entitled "the perfect Christmas present" and showed him in his underwear with a wrapped gift box on his lap.  Both Pow and Harrell assisted him with scanning the photographs on each occasion and did not complain to Hanabury about such requests or otherwise tell him that the requests made them uncomfortable.

Neither Pow nor Harrell complained about the content of his conversations with them, nor did they tell Hanabury that the conversations made them uncomfortable or that they did not want to engage in such conversations at work.  Pow and Harrell, however, claim that instead they overtly avoided contact with Hanabury, and that whenever they did so, Hanabury would retaliate by increasing his scrutiny and criticism of their work performance, increasing the amount of work assigned to them, and creating conflicts with them.  They also state that because Hanabury engaged them in conversations about his personal life at work, they were forced to work late into the evening to complete their work.  Harrell also claims that Hanabury would regularly tell employees that the Department was his ship and they could get off if they did not like how he ran it.

4. Harrell's Initial Resignation Discussion, November 2001

In November 2001, Harrell approached Hanabury to discuss her intent to resign. She indicated that she felt that Hanabury created an unhealthy work environment, that there was not enough teamwork, and that other groups were not completing their work, which created more work for her. She did not complain of gender discrimination or harassment. Hanabury told Harrell that he did not want her to resign, and asked Harrell to continue her employment for another six months, promising her that he would work to improve the atmosphere at the Department. Harrell did not resign.

5. Promotions and Restructuring, December 2001 to February 2002

In December 2001, Francis Petit ("Petit"), the Department's Director for New Product Development, resigned. At the time of his resignation, Petit had a doctoral degree. Harrell, who had only a bachelor's degree, assumed many of Petit's responsibilities. In conjunction with the early 2002 restructuring of the Department described above, Harrell was promoted to a Grade 12 position with the title of Assistant Director, Brand Development. She was also awarded a 5% salary increase to $52,000, retroactive to January 1, 2002. Harrell continued to report to Pow.

As part of the same February 2002 restructuring, Pow was promoted to Director of Marketing and Open Sales, a Grade 13

position.  She received a 5% salary increase retroactive to
January 2002.  In this new position, Pow had four people
reporting to her.  In February, Hanabury also gave Pow a very
positive review and continued to give her informal positive
feedback and encouragement in March.

    6.  The Copy Machine Incident, April 2002

    In April 2002, Pow sent an e-mail to Eggers that was carbon-
copied to Hanabury that criticized Eggers's management of a
problem with the color copier.  Hanabury had asked to be kept
informed of such problems due to prior similar incidents with
Eggers.  Eggers was upset with Pow for copying Hanabury on the e-
mail and told Hanabury that he was angry with Pow for having done
that.  Hanabury encouraged Eggers to speak with Pow directly and
to try and resolve the dispute.

    Eggers went into Pow's office, slammed the door, and yelled
at her for approximately one to two minutes, telling her that she
had no right to "cc" his boss and slammed the door as he left.
Eggers did not make any threats and was never closer than five
feet to Pow, although Pow states that Eggers repeatedly pounded
his clenched fist into the palm of his other hand.  Eggers did
not make any reference to Pow's gender or say anything sexual in
nature.  William Drawbridge ("Drawbridge"), another Department
employee, stated that he overheard the interaction between Eggers
and Pow, and that Pow appeared visibly shaken afterwards.

    Hanabury discussed the incident with Pow and her feelings

about it for approximately an hour later that same day.  Pow
states that she thought Hanabury treated the incident too
casually and that he chuckled during her meeting with him.  The
next day, on his way to London for business, Hanabury asked Pow
and Eggers to prepare a list of three things that each wished the
other would do more or less of, and when he returned, Hanabury
met with Eggers and Pow together to facilitate their discussion
of their expectations of one another and to mediate between them.
At no point during the meeting did Pow complain of gender
discrimination.

    7.  Ombuds Complaints and Resignations, April 2002 to
November 2002

Pow and Harrell complained to the Ombuds Office of the
University that Hanabury treated men and women differently in the
office.  Pow had complained in early 1999.  Harrell complained in
April 2002, and was advised that she could either resign or
complain to Human Resources.  The parties do not dispute that
University policy explicitly provides that complaints to the
Ombuds Office are "off-the-record and do not constitute formal
notice to the University."  Hanabury did not learn that any such
complaints had been made until June 2002.

On April 30, Harrell submitted her letter of resignation,
stating that she found the Department's "current working
environment personally hostile and [felt] extremely uncomfortable
continuing to work within the organization."  Harrell also stated

in her letter that she had "developed physical stress-related conditions including light-headedness, headaches, diarrhea and difficulties breathing." Harrell and Hanabury met the next day to discuss Harrell's feelings. Harrell did not mention gender discrimination in her letter. Harrell's last day was May 17. Harrell met with the Ombuds Office a second time after submitting her resignation. During her exit interview, Harrell complained to Susan Glancy in Human Resources about the Department's low morale.

On June 5, Hanabury met with Pow to go over her 2001-2002 year-end review; Hanabury gave Pow both positive feedback and constructive criticism and gave her an "above average" rating, which is the same level she received the prior year. Pow claims that Hanabury orally gave her a more negative assessment of her performance than is reflected in the written documentation associated with her year-end review by stating that he no longer regarded her as an above-average employee. Hanabury also advised Pow that he would have liked her to warn him that Harrell was experiencing problems so that he could have advised Pow on how to deal with her. Pow states that she attempted to discuss the negative environment at the Department and that Hanabury informed her that it would not change and that it "look[ed] like [she'd] be the next to leave."

Later that day, Pow submitted her letter of resignation. In her letter, Pow stated that "[g]iven the extent of unrest within Executive Education and the effect of the current environment on

my personal health" she had decided to resign and wanted to meet with Hanabury to discuss "a departure package and timeline." Hanabury met with Pow and explained that he did not want her to resign. Hanabury later reiterated this in a letter, writing that although "[i]n your annual review, I suggested that you would need to work on two areas of development with full commitment and enthusiasm[,] I regret that you may have interpreted this as me suggesting that you consider alternative options for employment," and that "[y]our dedication, creativity, passion, strategic-ability, and professional growth have been a pleasure to witness." Pow and Hanabury agreed that Pow would continue to work full time until June 28 and then she would work part-time, supplementing her time with her vacation until September 4. On June 24, Pow was awarded a $2,500 bonus, and on July 1, she received a 3.5% increase in salary. When Pow left the Department on September 4, she was earning $67,813.

In late June 2002, meetings took place between Glancy of Human Resources and other Department officials regarding complaints about Hanabury's management style and the Department's low morale and high turnover rate. In November 2002, Hanabury hired Elizabeth Zale, a woman, to replace Pow.

8. Harrell's Next Job and EEOC Charges, 2003 - 2004

Harrell began working at J. Walter Thompson Specialized Communications ("JWT") in January 2003. She filed an EEOC charge on February 21. Pow filed an EEOC charge on March 3.

In early 2003, Harrell spoke with Drawbridge about the possibility that the Department might use JWT's services. Harrell drafted a proposal for the Department to use JWT's and Harrell's services, but the Department rejected her proposal in a February 21 e-mail. Although Harrell speculated that Hanabury scuttled the proposal in order to retaliate against her for filing her EEOC charge, it is undisputed that the defendants first learned of Harrell's EEOC filing on March 12. Harrell also asserts that her failure to secure a deal with the Department on behalf of JWT in early 2003 led JWT to terminate her employment in November 2004.

9. Hanabury's Treatment of Other Female Employees

Pow and Harrell have offered evidence from two other women who once worked in the Department. Lorrie Foster ("Foster"), who resigned in June 1999, and had held the position of Executive Director of Open Enrollment prior to Levy, states that Hanabury treated female employees differently from male employees. Foster refers to times when Hanabury yelled at her for being late to work or for requesting to work from home to be with her child, but states that she never heard Hanabury treat male employees that way. She also stated in her deposition that Hanabury was angry with her when she left the office before the dinner hour. Foster admitted, however, that she was never asked to go to dinner with Hanabury. As an example of the scrutiny to which she was exposed, Foster points to an occasion where Hanabury was on

vacation in 1998 or 1999 and asked Sitterle to check the time sheets to find out what time Foster left work one evening. Foster met with the Ombuds Office twice between April and June 1999 to discuss Hanabury's treatment of her.

Carol Reese, the Department's financial manager, states that Hanabury would discuss his personal life with her at work but that she would attempt to ignore it. She states that she received an outstanding evaluation from Hanabury in 1999, but that when she explained that she was interested in advancing her career, Hanabury became abusive and demeaning towards her, including criticizing her performance and telling her that she was "not Columbia material." Reese also states that Hanabury increased her workload and took away her strategic responsibilities. Reese complained to the Ombuds Office twice, and resigned in July 2000.

C.  The Claims

The plaintiffs have filed nine claims. The three plaintiffs allege in three separate claims that Columbia discriminated against them on the basis of their sex, including Palomo's pregnancy, and fostered a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and that all three defendants did so in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("State HRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 et seq. ("City HRL"). They

25

allege in three additional claims that Columbia retaliated against each of them in violation of Title VII, and that all three defendants retaliated against them in violation of the State and City HRL. In two additional claims they allege that Hanabury and Sitterle aided and abetted these violations in violation of the State and City HRL. The final cause of action brought by each plaintiff against each defendant is for intentional infliction of emotional distress. The plaintiffs have withdrawn this last claim.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R. Civ. P.; accord Burt Rigid Box, Inc. v. Travelers Property Cas. Corp., 302 F.3d 83, 91

(2d Cir. 2002).

A.  Palomo's Claims

Palomo's claims may be reduced to four categories: pregnancy discrimination, hostile work environment, retaliation, and constructive discharge.  This section addresses each of those claims in turn.

1.  Pregnancy Discrimination

Palomo contends that the defendants discriminated against her during her pregnancy because she was pregnant.  Claims of employment discrimination brought pursuant to Title VII are analyzed under the burden-shifting approach set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). The same standard applies to employment discrimination claims brought pursuant to the State and City HRL.  Weinstock v. Columbia University, 224 F.3d 33, 42 n.1 (2d Cir. 2000).  A plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Williams v. R.H. Donnelly Corp., 368 F.3d 123, 126 (2d Cir. 2004).  To satisfy this burden, a plaintiff alleging discrimination must establish that

> (1) [s]he is a member of a protected class; (2) [s]he is competent to perform the job or is performing his duties satisfactorily; (3) [s]he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class.

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).

27

A plaintiff's burden in presenting prima facie evidence is <u>de minimis</u>.  <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 467 (2d Cir. 2001).

If the plaintiff establishes a prima facie case, she "creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action." <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000)(citation omitted); <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 380 (2d Cir. 2003).  Once the employer articulates a nondiscriminatory explanation, the burden shifts back to the employee to prove, by a preponderance of the evidence, that the adverse employment decision was discriminatory.  <u>Mandell</u>, 316 F.3d at 381.  A plaintiff's demonstration that the employer's proffered reason is pretextual may provide evidence of discrimination.  <u>Id.</u>

The plaintiff bears the ultimate burden of persuading the trier of fact that her employer intentionally discriminated against her.  <u>James</u>, 233 F.3d at 154; <u>see also</u> <u>Reeves v. Sanderson Plumbing Prod.</u>, 530 U.S. 133, 153 (2000).  "Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  <u>James</u>, 233 F.3d at 154.

To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or

played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." <u>Back v. Hastings on Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 123 (2d Cir. 2004) (citation omitted). Conclusory statements and general attacks on the defendant's credibility are insufficient to defeat a motion for summary judgment. <u>Opals on Ice Lingerie v. Body Lines</u>, 320 F.3d 362, 370 n.3 (2d Cir. 2003); <u>see also</u> <u>Crawford El v. Britton</u>, 523 U.S. 574, 600 (1998).

Palomo has identified what she contends were two adverse employment actions that she suffered as a result of discrimination based on her pregnancy. She contends that she was demoted on September 12, 2002, when she was required to report to Sitterle instead of Hanabury. Secondly, Palomo contends that the criticism of her work and the pressure to do work while pregnant constitute an adverse employment action.

"Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." <u>Williams v. R.H. Donnelley, Corp.</u>, 368 F.3d 123, 128 (2d Cir. 2004) (citation omitted). <u>See also</u> <u>Fairbrother v. Morrison</u>, --- F.3d ---, No. 03-9242-CV, 2005 WL 1389894, at *13 (2d Cir. June 14, 2005). These examples demonstrate that "to be

materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Williams, 368 F.3d at 128 (citation omitted). See also Fairbrother, 2005 WL 1389894, at *13.

The core of Palomo's discrimination claim is that Hanabury demoted her on September 12 by telling her that she should report in the future to Sitterle instead of to him. It is undisputed that Sitterle was senior to Palomo in title and grade, and that this change in the reporting structure did not alter Palomo's title, grade, salary or benefits. This change in the line of reporting does not by itself constitute an adverse employment action.[8]

To establish that what she characterizes as a demotion was an adverse employment action, Palomo points to the following three additional circumstances. Professor Schon Beechler, contends that she viewed Sitterle and Palomo as organizational equals despite Sitterle's senior rank.[9] This opinion, even if admissible evidence, is not sufficient to convert the change in

_____

[8] For this reason, Palomo's argument that Alban-Davies v. Credit Lyonnais Sec. (USA) Inc., No. 00 Civ. 6150 (DLC), 2001 WL 884113 (S.D.N.Y. Aug. 8, 2001), compels a different result is misplaced. In Alban-Davies, the plaintiff submitted evidence that he had been removed as the head of a division of a financial services company, had been pushed down two reporting levels, and had lost a private office and trading authority, among other things. Id. at *1, 7.

[9] Beechler represents that "Ms. Palomo and Ms. Sitterle were considered equals at Executive Education, and it was clear that making Ms. Palomo report to Ms. Sitterle was a demotion." To the extent that Beechler seeks to convey the opinion of any other Department employee, that is not admissible evidence. See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 87 (2d Cir. 2005).

the reporting structure into an adverse employment action.

Relying on a memorandum she wrote on January 17, 2003, Palomo asserts that the September 12 action resulted in a wholesale elimination of material job responsibilities, including a loss of her relationship management responsibilities, requiring her to handle administrative work and event coordination. The January 17 memorandum does not establish that Palomo's job responsibilities were materially altered in a discriminatory fashion during and as a result of her pregnancy. The January 17 memorandum, which Palomo wrote to respond to a written description of "job expectations," was part of a dialogue that occurred months after the September 12 meeting and weeks after the termination of her pregnancy. To the extent Palomo relies on the January 17 memorandum as evidence of retaliatory treatment, that is addressed below.

Finally, Palomo asserts that she was denied the opportunity to travel to Brazil in January 2003 despite the fact that she was no longer medically restricted from traveling. Palomo does not dispute that another employee was asked to travel to Brazil in her stead at a point in time when she informed the Department that she could no longer travel. She did not ask the Department to replace that employee on the Brazil trip once she was free to travel, and the Department's failure to make that change unilaterally does not constitute an adverse employment action.

With respect to the second adverse action she has identified, the criticism of her work while she was pregnant,

Palomo has also failed to establish the existence of an adverse employment action. Palomo has shown that in meetings on November 8 and 14, Hanabury and Sitterle questioned and then criticized Palomo's work effort. She contends that in two instances unnecessarily short deadlines were imposed on her.[10] She asserts that the complaints that her work reflected a lack of effort and dedication were unfair. While she admits that she was unable to work the same hours during her pregnancy that she had before the pregnancy, she asserts that the criticism was unfair because the defendants have not shown that she was unable to complete all of her work responsibilities in the time she did spend at the office.

"[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." Fairbrother, 2005 WL 1389894, at *14. The Second Circuit has "rejected a claim of an adverse employment action based on an 'unsatisfactory' evaluation that was either threatened or actually received" where there was no diminution in salary or benefits. Id. (citation omitted).

To the extent that Palomo argues that the criticism of her work created a hostile work environment, that argument is addressed below. Because Palomo has failed to show that the defendants took an adverse employment action against her during

---

[10] The onerous deadlines she has identified were for tasks she was asked to perform in mid-November 2002.

the period of her pregnancy, the defendants' motion for summary
judgment on her pregnancy discrimination claim is granted.

   2.  Hostile Work Environment

   Palomo contends that Hanabury and Sitterle created a hostile
work environment during her pregnancy.  Title VII prohibits "a
discriminatorily hostile or abusive [work] environment."  Harris
v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  The same
Title VII hostile work environment standard applies to hostile
work environment claims brought pursuant to the State and City
HRL.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir.
2000); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d
Cir. 1998).  To prevail on a claim that harassment caused a
hostile work environment in violation of Title VII, a plaintiff
must establish two elements.  The plaintiff must show: "(1) that
the harassment was sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment, and (2) that a specific basis exists for
imputing the objectionable conduct to the employer."  Alfano v.
Costello, 294 F.3d 365, 373 (2d Cir. 2002) (citation omitted).

   Unlike claims of discrimination based on disparate treatment
or retaliation, a hostile work environment claim is "based on the
cumulative effect of individual acts."  Nat'l R.R. Passenger
Corp. v. Morgan, 536 U.S. 101, 115 (2002).  Title VII is violated
"when the workplace is permeated with discriminatory
intimidation, ridicule, and insult, that is sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 116 (citation omitted).

Hostile work environment claims must meet both an objective and a subjective standard. Not only must the victim herself "subjectively perceive [the] environment to be abusive," but the misconduct of which a plaintiff complains also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004) (citation omitted). As a general matter, the conduct of which a plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

Palomo has not presented sufficient evidence from which a jury could infer that the defendants created a hostile work environment during the thirteen days she was at work between September 12 and November 15, 2002. She has identified no event or set of events that was severe, and has not presented sufficient evidence to raise a question of fact that there was pervasive discrimination against her during those days because of her pregnancy. It is undisputed that Palomo met with Hanabury and Sitterle on only three occasions during that period: September 13, and November 8 and 14. Palomo has also referred to

Sitterle's e-mail requests of her on November 8, 11 and 12.

As far as the September 13 meeting was concerned, Palomo was unable to identify what pressure either Hanabury or Sitterle placed on her except that she was asked to find an interpreter to translate a document before leaving on vacation. It was at the November 8 meeting with Sitterle and Palomo, that Hanabury expressed concerns about Palomo's level of effort. During her deposition Palomo could not remember anything derogatory being said, other than the complaint about her level of effort. Nor could she identify any projects discussed at that meeting that placed her under stress. At the November 14 meeting with Sitterle and Palomo, Hanabury expressed disappointment in Palomo's performance and reminded Palomo that paid disability leave was available to her if she was having difficult with her work load due to her health. The three e-mails concerned requests that Palomo perform certain tasks. Cumulatively, and taking all inferences in the plaintiff's favor, meetings that review performance and assign tasks, and the assigning of tasks, are not the type of conduct or activity that, except in the case of unusual circumstances not present here, create or constitute a hostile work environment.

Palomo contends that the defendants increased her workload and criticized her work "at a time in her life when she was vulnerable to their attacks." She has not presented evidence, however, of what she did during the thirteen days she was at work to allow a fact finder to infer that the defendants had unfairly

increased her workload.  Certainly the few assignments she points to do not constitute the creation of a hostile work environment. Moreover, Palomo has not presented any evidence to support a claim that the defendants increased her workload beyond what had previously been expected of her.  Finally, despite Hanabury's request, she never presented the defendants with any doctor's note or even told them that her doctor had placed any restrictions upon her work beyond the travel restriction, which she admits they readily accommodated.  She admits that they reminded her of the availability of paid disability leave if she needed to take leave beyond what she had already taken.  While she questions their motive in pointing this out -- arguing that they in fact wished her to resign -- she does not dispute that the availability of such paid leave was to her advantage, was not discriminatory, and that she did take advantage of that program during her pregnancy.

Palomo's argument that the defendants should have "accommodated" her pregnancy by letting her work less hard than she had previously worked or than an employee at her grade level was expected to work at the Department may proceed from a misunderstanding of the law.  Employers are not required to "take . . . steps to make it easier for pregnant women to work," Troupe v. May Department Stores Co., 20 F.3d 734, 738 (7th Cir. 1994), nor are they required to "make alternative work available." Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1316 (11th Cir. 1994).  Rather, when employees cannot work due to pregnancy-

induced disability, "they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working." Id. (citation omitted). Thus, an employer must only reasonably accommodate pregnant employees when the employer offers such accommodation to "similarly affected employees." Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 437 (8th Cir. 1998). See also Gratton v. JetBlue Airways, No. 04 Civ. 7561 (DLC), 2005 WL 1251786, at *7 (S.D.N.Y. May 25, 2005). Palomo has not offered any evidence that other disabled employees at her grade level were given an accommodation that was denied to her when she was pregnant.

Finally, most of Palomo's hostile work environment claim rests on her feeling that she was being pressured to work harder than she was working, and her feelings of stress at a vulnerable point in her life. She made her initial complaint of discrimination at a time when she believed that that stress and pressure had caused her miscarriage. Palomo's grief at the loss of this pregnancy is entirely understandable, and she is entitled to great sympathy. But, as she now concedes, there is no basis to blame the defendants for her miscarriage. The issue on this motion is whether she has presented evidence from which a jury could find an objective level of hostility that was "sufficiently severe or pervasive to alter the conditions of" Palomo's employment and "create an abusive working environment." Harris, 510 U.S. at 21. She has not presented such evidence.

3. Retaliation and Constructive Discharge

Palomo contends that the defendants retaliated against her for her complaints of discrimination, and that through that retaliation she was constructively discharged. Title VII forbids discrimination against an applicant for employment "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the auspices of that statute. 42 U.S.C. § 2000e-3(a). The primary purpose of this provision is "maintaining unfettered access to Title VII's remedial mechanisms." McMenemy v. City of Rochester, 241 F.3d 279, 284 (2d Cir. 2001) (citation omitted).

Courts apply the McDonnell Douglas burden-shifting approach to analyze claims of retaliation pursuant to Title VII. Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003). "In order to establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004) (citation omitted). For a plaintiff's conduct to constitute participation in a protected activity, it is enough that he has made "informal protests of discrimination, including making complaints to management." Gregory v. Daly, 243 F.3d 687, 700-01 (2d Cir. 2001) (citation omitted).

Moreover, "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied.  The plaintiff is only required to have had a <u>good faith, reasonable belief</u> that he was opposing an employment practice made unlawful by Title VII." <u>McMenemy</u>, 241 F.3d at 285 (emphasis supplied.)  Whether a plaintiff's belief is reasonable must be "assessed in light of the totality of the circumstances." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 292 (2d Cir. 1998).  As to the third prong of the test, a plaintiff may indirectly establish the causal connection needed for a prima facie case by "showing that the protected activity was closely followed in time by the adverse action." <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 217 (2d Cir. 2001) (citation omitted).

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 151-52 (2d Cir. 2003).  Courts therefore typically focus on two requirements contained within this standard: "the employer's intentional conduct and the intolerable level of the work conditions." <u>Petrosino</u>, 385 F.3d at 229.

With respect to the intent requirement, "if a plaintiff suing for constructive discharge cannot show specific intent, he or she must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." <u>Id.</u> at 229-

30 (citation omitted).  The inquiry whether the employer's deliberate actions created work conditions so intolerable as to compel resignation is made "objectively by reference to a reasonable person in the employee's position."  Id. at 230.  This requires that there be "the sort of circumstance that would cause a reasonable person to conclude that quitting was the only way she could extricate herself from intolerable conditions."  Id. at 231.  "[T]he law is clear that a constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title . . . ."  Id.

Palomo identifies the following events as the adverse employment actions taken in retaliation for her complaint of discrimination on November 29 and EEOC filing: she was denied the opportunity to travel to Brazil in January 2003; she was denied a vacation request in February 2003 for the first time in her career; she was precluded from signing holiday cards sent to Department clients; Sitterle contacted alumni in the Fall of 2003 directly without informing Palomo; Palomo was excluded from a team-wide meeting; her job description was down-graded by the substitution of supervisory and management duties with administrative and coordination tasks; her work was unfairly criticized.

Palomo has not shown that there is an issue of fact as to whether the defendants retaliated against her.  First, several of the events to which she points do not constitute adverse

employment actions.  Palomo does not deny that a fellow employee was asked to take her place on the trip to Brazil after she told the defendants she could not travel.  It is not an adverse employment action or evidence of discrimination in such circumstances to allow the substitute employee to make the trip even though Palomo actually had no travel restrictions by the time of the trip.[11]  It is not an adverse employment action to deny a single vacation request, particularly when you invite another vacation request,[12] or to send out holiday cards in an employee's absence during the holiday season.  Palomo asserts that she was not invited by Sitterle to join one meeting of Sitterle's group, but has not presented any evidence that she should have been invited; for instance, she has not presented evidence of the topic of the meeting.  Similarly, it is not an adverse employment action for the person traveling to see clients to contact those clients directly.[13]

Palomo has not identified any unfair criticism of her performance that occurred once she returned to work following her pregnancy.  Indeed, as described in her memorandum of law in

---

[11]  It is telling that Palomo herself never asked to take the trip after her pregnancy ended.  It is also understandable why she did not make that request.  If she had gone, the defendants would have had to deny that opportunity to someone who had been planning to go in her stead.

[12]  Palomo's vacation requests for December and March were granted.

[13]  Sitterle contacted the clients long after Palomo had left Sitterle's group.  After April 2003, Palomo was no longer working on Sitterle's team.

opposition to this motion, it appears that upon her return from her disability leave and vacation she quickly achieved her goal of separating herself from Sitterle's oversight. The memorandum describes that on January 23, Hanabury informed her that she would again be reporting to him directly, and in April he removed her from Sitterle's team and gave her what she describes as a "favorable" review.

The only remaining action that Palomo has identified is the downgrading of her responsibilities. It is not entirely clear to what Palomo is referring.[14] On January 17, Sitterle and Palomo exchanged e-mails regarding Palomo's position expectations. Nothing was resolved in that exchange, and six days later Hanabury told Palomo that she would be reporting directly to him. They discussed Palomo's job as including responsibility for developing and maintaining alumni relationships. Palomo has not offered any evidence that she complained at that time or in the following months of her work assignments or job description and has not pointed to any discriminatory treatment following her meeting with Hanabury.

In sum, Palomo has not shown that she suffered any adverse employment action following her complaints of discrimination or that her work conditions became so intolerable that she was forced to quit against her will. To the contrary, with her complaints she achieved her goal of extracting herself from

---

[14] It would appear that Palomo is actually referring to the work she was assigned during her pregnancy when she could not travel and was asked to help Sitterle's team in other ways.

Sitterle's supervision.  Hanabury agreed that she could return to reporting to him and soon removed her from Sitterle's group altogether.  Palomo's claims are dismissed.

B.  Harrell's and Pow's Claims

Harrell's and Pow's claims also may be reduced to four categories: gender discrimination, hostile work environment, constructive discharge, and retaliation.  This section addresses each of those claims in turn.

1.  Sex Discrimination

Pow and Harrell claim that they were discriminated against on the basis of their sex in that male employees were not required to spend hours of their working day engaged in personal conversations with Hanabury.[15]  Even if engaging in extended personal conversations during the work day can constitute an adverse employment action, and it is not clear that it can, the plaintiffs have not presented sufficient evidence from which a jury could reasonably infer that Hanabury chose to have these discussions with them because of their gender.  Their own evidence supports the inference that Hanabury chose to talk to them based on his judgment that fellow homosexuals would be receptive to his chatter, or his belief (albeit misguided) that Pow and Harrell were his friends.  In particular, Pow and Harrell

_____

[15]  On summary judgment, Pow abandons her claim that Hanabury and Columbia discriminated against her by not sponsoring her for the "EMBA" program.

43

do not point to any content in the conversations that suggests that they were targeted for the conversations because of their gender.  It is also undisputed that there were other women with comparable jobs in the Department with whom Hanabury did not have such personal conversations, such as Palomo and Foster, and a man in the Department with whom he did have personal conversations, to wit, Eggers.  Because Pow and Harrell have not presented sufficient evidence from which a jury could conclude that Hanabury spent hours at work discussing personal matters with them because of their gender, their claim of gender discrimination due to disparate treatment fails.[16]

2.  Hostile Work Environment and Constructive Discharge

Pow and Harrell cite seven aspects of their working relationship with Hanabury that they claim created a hostile working environment for them.  First, Hanabury tolerated Levy's use of gay pornographic materials in the office and expressed indifference over Harrell's witnessing Levy engaging in sexual activity in his office.[17]  Second, Hanabury encouraged Eggers' abuse of Pow and was dismissive of Pow's complaint that she felt

_____

[16]  In discussing this claim, the plaintiffs refer to Hanabury's treatment of Levy and Foster in the 1990s.  Some of their assertions are unsupported by admissible evidence.  None of their assertions are relevant to this specific claim since they do not involve Hanabury's discussion of personal matters at the office and do not tend to show why Hanabury chose to have such conversations with the plaintiffs.

[17]  The plaintiffs also accuse Hanabury of allowing Levy to leave the office during working hours to engage in sex, but have offered no evidence to support this.

44

physically threatened by Eggers' outburst. Third, they reiterate that Hanabury had personal conversations with them for hours every day, which wasted their time and exposed them to what they characterize as a graphic discussion of his sex life.[18]  Fourth, Hanabury had dinner with them, where he would subject them to more personal conversations about topics including his dating life and his interest in bathing suits.  Fifth, Hanabury asked them to scan personal photographs of himself, including at least one depicting him in his underwear.  Sixth, they claim that Hanabury coerced them to engage in the personal conversations with him by subjecting them to unfair criticisms and increases in their workload whenever they sought to avoid him, and by dictating which exit they could use to leave the Department at the end of the day.  Seventh, Hanabury told them that the environment would not change at work and that if they wanted a change, they would have to leave the Department.

### a.  Severity or Pervasiveness

The most serious of these accusations concerns Levy's activity in early 2000, more than three years before Pow and Harrell filed their claims in this lawsuit.  Columbia and Hanabury acted promptly after Harrell interrupted Levy's improper sexual activity in the office and Levy resigned.  This episode is too unconnected to the other issues of which the plaintiffs

---

[18]  In terms of graphic discussions, the plaintiffs have only identified Hanabury's single conversation regarding the fact that he had had a very good night.

complain and too remote in time to be considered part of any pattern or otherwise to assist the plaintiffs in their hostile work environment claim.

The only other incident concerning something other than the plaintiffs' personal relationship with Hanabury is the confrontation in April 2002 between Eggers and Pow over the memorandum Pow had sent regarding Eggers' management of the color copier. While Pow is critical of Hanabury's management of this workplace incident, the incident is neither severe nor representative of pervasive conduct that could be said to create a hostile work environment.

The nub of the hostile work environment claim, and indeed their constructive discharge claim, is the assertion by Pow and Harrell that they were engaged against their will in the conversations with Hanabury about his personal life both in the office and during their frequent dinners. The difficulty with their claim that they resented these conversations is that neither Pow nor Harrell ever objected to Hanabury, or ever refused. They never explained that they were too busy, or had other plans for the evening. They never indicated an unwillingness to help him use the office scanning machine. To fill this gap, the plaintiffs contend that when they tried to avoid him, Hanabury coerced them into continuing to be available to him by increasing their workload, unfairly criticizing their

work, and explaining that nothing would change.[19]  The only
examples of criticism they point to are isolated instances of
informal criticism that were not memorialized in writing, and
that occurred in the context of a long history of praise,
positive reviews, salary increases, and promotions.

Pow and Harrell certainly describe bad judgment by a
supervisor and unprofessional conduct in the workplace.  The
issue here, however, is whether their description of Hanabury's
conduct, if credited by a jury, could constitute the creation of
a hostile work environment that sufficiently altered the
conditions of their employment.  On one hand, Pow and Harrell
have identified few conversations with Hanabury with sexual
content.  On the other, they have described one objectionable
reference to a previous night's date, and it is undisputed that
Hanabury showed them pictures of himself in his underwear.
Hanabury also commented generally on the personal appearance and
attractiveness of employees, and asked for suggestions of men to
date.

What is missing from the plaintiffs' accusations is conduct
by Hanabury that was permeated with "discriminatory intimidation,
ridicule, and insult."  Morgan, 536 U.S. at 116.  While the

_____

[19]  While a significant disparity in position or blatantly
inappropriate discourse would likely obviate any need for a
plaintiff to assert that she had objected, Pow and Harrell are
sensitive to the fact that it is unusual in the circumstances
presented here that they did not share their views with Hanabury.
They do not contest that their failure to object contributed to
Hanabury's misguided belief that he could confide in them because
they were his friends.

conversations were unwanted from the plaintiffs' point of view, the plaintiffs do not contend that Hanabury discussed his personal life with them in order to harass, intimidate, ridicule, or insult them in some way, or even that they perceived that to be his motive.  While Hanabury imposed on their time, they do not allege that they perceived him to be motivated by a desire to harass them.  It does not appear, therefore, that they have presented evidence from which a jury could conclude that Hanabury created a work environment that was hostile to them based on either the objective or subjective standards of a hostile work environment claim.  Because their claim fails for other reasons, however, it is unnecessary to resolve this issue.

b.  Motivation Based on Pow's and Harrell's Sex

Even if Pow and Harrell were able to satisfy the pervasiveness element of a hostile work environment claim, for the reasons already described in connection with the disparate treatment claim, they are unable to demonstrate that any harassment was "because of" their sex.  "It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."  Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001).  "In determining whether an employee has been discriminated against because of such individual's sex, the

courts have consistently emphasized that the ultimate issue is the reasons for <u>the individual plaintiff's</u> treatment, not the relative treatment of different <u>groups</u> within the workplace." <u>Id.</u> (emphasis in original) (citation omitted).

Pow and Harrell have presented no evidence supporting the notion that Hanabury targeted them for excessive conversation because they are women, or required them to go to dinner with him because they are women, or asked them to scan photographs for him because they are women.[20]  None of the evidence suggests that the content of his communications with them was affected by their gender.

To show that the conduct to which they object was "because of" their gender, as opposed to their perceived friendship, Pow and Harrell rely on a statement by a male employee, Drawbridge, that he was unaware that Hanabury subjected any male employees to the same conversations that Hanabury had with Pow and Harrell. Drawbridge can only speak for himself, <u>see</u> <u>Woodman</u>, 411 F.3d at 87, and it is undisputed that Hanabury did have personal conversations with the only male senior level administrative employee, Eggers, and did not have personal conversations with certain female senior level administrative employees, to wit, Foster and Palomo.  Given this record, the jury would have no

---

[20]  They also have presented no evidence that Eggers' or Levy's conduct targeted Pow and Harrell because they are women. There is no evidence that Levy was aware or intended that Pow or Harrell would view his misbehavior.  Eggers' outburst was triggered by Pow's decision to add a "cc" that advised Hanabury of her complaint regarding Eggers.

evidentiary basis to find that Hanabury chose to engage Pow and Harrell in these conversations because of their gender. The evidence points only to Hanabury's mistaken judgment as to the existence of a friendship, and the assumptions he made because of their sexual orientation. For this reason, the claim based on a hostile work environment and the intertwined claim of constructive discharge are dismissed.

### 3. Retaliation

Pow and Harrell contend that they complained of gender discrimination to Hanabury during resignation discussions in November 2001 and April and June 2002, to the Columbia Ombuds Office in early 1999 and April and May 2002, and to the EEOC on February 21 and March 3, 2003. In retaliation for their complaints to Hanabury, Harrell and Pow contend that they were constructively discharged.[21] Harrell asserts that, in retaliation for her EEOC complaint, Hanabury ordered the Department not to do business with her new employer.

Pow and Harrell have not shown that their complaints to Hanabury constituted protected activity; they never complained to Hanabury of discrimination. Rather, they complained about issues such as low morale within the Department and Hanabury's alleged indifferent management style.

---

[21] Although the plaintiffs' memorandum of law in opposition to summary judgment explicitly makes a retaliation claim only for Harrell, it is appropriate to infer that a similar claim is also being made for Pow.

The only evidence regarding Hanabury's knowledge of Pow's and Harrell's complaints to the Ombuds Office is that Hanabury learned about them in June 2002, after Harrell had resigned and after Pow had submitted her resignation. Thus, Pow and Harrell have not generated a material issue of fact concerning whether Hanabury knew of their participation in a protected activity, assuming the complaints to the Ombuds Office constituted protected activity, prior to their announcements of their decisions to leave Columbia.[22]

The final instance of retaliation is similarly flawed. The Department rejected the proposal from Harrell and her new employer weeks before it learned of her EEOC filing. Therefore, the retaliation claims for both Pow and Harrell are dismissed.

## CONCLUSION

The defendants' motion for summary judgment is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          July 20, 2005

_____
               DENISE COTE
          United States District Judge

---

[22]    Even after Pow had submitted her resignation, instead of suffering an adverse employment action, she received both a bonus and a raise.